**Dated: February 13, 2020**

**The following is ORDERED:**



TOM R. CORNISH
UNITED STATES BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF OKLAHOMA

In re:

**PAMELA SUE CHRISTIE,**          Case No. 10-82219-TRC
                                  Chapter 13
         Debtor.

**PAMELA SUE CHRISTIE**,
         Plaintiff,
vs.                                           Adversary No. 19-8002-TRC

**FORT GIBSON STATE BANK**,
         Defendant.

## **OPINION**

       Plaintiff Pamela Sue Christie seeks to recover damages from Defendant Fort Gibson State Bank for violations of the automatic stay and discharge injunction. Plaintiff Christie's confirmed chapter 13 plan provided that she would pay off the Bank's secured claims in full during the life of the plan, and the Bank would then release its liens. Plaintiff Christie completed her chapter 13 plan; however, before it would release its liens, the Bank required her to pay additional funds. The question for the Court is whether this was a violation of the automatic stay and discharge

injunction. Having carefully reviewed the record, exhibits and testimony of the parties, the Court has concluded that Plaintiff Christie has met her burden of proof; therefore, the Court finds that the Bank did violate the automatic stay.

**I.      Jurisdiction**

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b), and may hear and determine this case pursuant to 28 U.S.C. § 157. Venue is proper pursuant to 28 U.S.C. § 1408.

**II.     Findings of Fact**

**A.     Stipulations of Fact in the Pretrial Order**

1.      On December 13, 2010, the Plaintiff filed her Chapter 13 Bankruptcy Petition and Schedules in the Eastern District of Oklahoma.

2.      At the time of filing her bankruptcy, the Plaintiff owned certain real property as described in her Chapter 13 bankruptcy petition and schedules (hereinafter the "Real Estate").

3.      At the time of filing her Chapter 13 bankruptcy, the Plaintiff owned a 2006 Ranger Boat, motor and trailer as described in her Chapter 13 bankruptcy petition and schedules (hereinafter the "Boat").

4.      On a date prior to the filing of her Chapter 13 bankruptcy, the Plaintiff pledged the Real Estate and the Boat as collateral to Fort Gibson State Bank under a nonpurchase money loan (hereinafter the "Real Estate and Boat Loan").

5.      At the time of filing her Chapter 13 bankruptcy, the Plaintiff owned a 2006 Jayco 32 ft. Travel Trailer as described in her Chapter 13 bankruptcy petition and schedules (hereinafter the "Travel Trailer").

6. On a date prior to the filing of her Chapter 13 bankruptcy, the Plaintiff pledged the Travel Trailer as collateral to Fort Gibson State Bank under a nonpurchase money loan (hereinafter the "Travel Trailer Loan").

7. On December 13, 2010, the Plaintiff filed her Chapter 13 Plan and Summary of Chapter 13 Plan (hereinafter the "Initial Chapter 13 Plan").

8. Fort Gibson State Bank received notice of the Initial Chapter Plan.

9. The Initial Chapter 13 Plan provided for the payment of a secured claim of $60,000.00 to Fort Gibson State Bank on the Real Estate and Boat Loan.

10. The Initial Chapter 13 Plan provided for the payment of a secured claim of $15,000.00 on the Travel Trailer Loan.

11. On January 24, 2011, Fort Gibson State Bank filed its secured proof of claim on the Real Estate and Boat Loan wherein Fort Gibson State Bank stated the amount of the secured claim to be $68,824.78. Such claim was identified as Claim 12-1 on the Court's Claim Register.

12. On January 28, 2011, Fort Gibson State Bank filed its amended secured proof of claim on the Real Estate and Boat Loan wherein Fort Gibson State Bank stated the amount of the secured claim to be $68,195.49. Such amended claim was identified as Claim 12-2 on the Court's Claim Register.

13. On January 24, 2011, Fort Gibson State Bank filed its secured proof of claim on the Travel Trailer Loan, wherein Fort Gibson State Bank stated the amount of the secured claim to be $16,074.54. Such claim was identified as Claim 9-1 on the Court's Claim Register.

14. On January 28, 2011, Fort Gibson State Bank filed its amended secured proof of claim on the Travel Trailer Loan, wherein Fort Gibson State Bank stated the amount of the secured claim to be $16,074.54. Such amended claim was identified as Claim 9-2 on the Court's Claim Register.

15. On June 3, 2011, the Plaintiff filed her Amended Plan and Summary, Notice of Incorporation of terms of Original Plan and Statement of Material Changes to Treatment of Claims (hereinafter the "First Amended Plan").

16. The First Amended Chapter 13 Plan provided for the payment of a secured claim of $68,195.49 to Fort Gibson State Bank on the Real Estate and Boat Loan.

17. The First Amended Chapter 13 Plan provided for the payment of a secured claim of $16,074.54 on the Travel Trailer Loan.

18. Fort Gibson State Bank received notice of the First Amended Chapter 13 Plan and Summary filed on June 3, 2011, was confirmed by order of the Bankruptcy Court.

20. Pursuant to 11 U.S.C. § 1327(a), the "[p]rovisions of a confirmed plan bind the debtor and each creditor . . . ."

21. The confirmed Chapter 13 Plan listed the Real Estate and Boat Loan and the Travel Trailer Loan as Class IA Claims.

22. Pursuant to the Confirmed Chapter 13 Plan and 11 U.S.C. § 1325(a)(5), Class I Claims are claims of creditors who possess a security interest in property where such claims shall be fully satisfied through distributions from the Trustee. All debts provided for in Class I shall be discharged upon entry of a discharge under Title 11.

23. Pursuant to the Confirmed Chapter 13 Plan, "Creditors whose claim(s) are provided for under Class I.A. shall release their lien(s) upon entry of a discharge under 11 U.S.C. § 1328(a).

24. As confirmed, the Chapter 13 Plan provided for payment in full with interest on both of the secured claims of Fort Gibson State Bank.

25. The Plaintiff completed her Chapter 13 Plan and the Chapter 13 Trustee filed a Notice of Completion of Plan Payments on September 21, 2015.

26. A copy of the Notice of Completion of Plan Payments was mailed to and received by Fort Gibson State Bank.

27. On November 20, 2015, the Plaintiff filed the Chapter 13 Debtor's Certification of Compliance and Motion for Entry of Discharge.

28. A copy of the Chapter 13 Debtor's Certification of Compliance and Motion for Entry of Discharge was mailed to and received by Fort Gibson State Bank.

29. After the Plaintiff completed her Chapter 13 Plan, Fort Gibson State Bank demanded additional funds to release the mortgage from the Real Estate and the liens from the Boat and the Travel Trailer.

30. On October 28, 2018, the Plaintiff made a written demand upon Fort Gibson State Bank for the return of the $16,600.59.

31. Fort Gibson State Bank is a sophisticated creditor. On July 4, 2015 Jerry Lee Christie, Pamela Christie's husband, executed Promissory Note and Security Agreement #68188 to Bank in the principal amount of $10,092.25. Note 68188 is secured by a 2006 Toyota Highlander automobile.

32. The debt of Jerry Christie under Note 68188 was not scheduled in Pamela Christie's bankruptcy.

33. The 2006 Toyota Highlander pledged by Jerry Christie was not listed as an asset in Pamela Christie's bankruptcy.

34. A release of the mortgage filed in Book 858 at page 862 of the Cherokee County Clerk made by Jerry Lee Christie and Pamela Christie was released of record by a release of mortgage dated May 19, 2015 and filed of record on May 22, 2015 in Book 1120 at page 461 of the Cherokee County Clerk's land records.

35. Upon receipt of payment of the new, postpetition loan advances to Pamela Christie, Bank released its lien of the Jayco Travel Trailer.

**B.    Additional Findings of Fact**

The Court heard testimony from just two witnesses at trial, Plaintiff Christie and James Matthew Hendrix, former President of Fort Gibson State Bank.[1] Hendrix was not the loan officer assigned to Plaintiff's loans, nor the loans of her nondebtor husband, Jerry Christie. However, he was aware that the Christies were bank customers. The Plaintiff's loan officer was Susan Chapman.[2] Hendrix was aware of the October 28, 2018 letter in which the Plaintiff made a written demand upon Fort Gibson State Bank for the return of the $16,600.59 paid to release liens in December of 2015. The letter prompted Hendrix to audit the Plaintiff's loans, advances and payments. He also reviewed Jerry Christie's loans. From the audit, Hendrix determined that the payoff amount requested of $16,600.59 was the correct amount owed to the Bank by the Christies. This amount included the loan advances made to the Plaintiff during her bankruptcy that were added to her Travel Trailer note and the amount owed on Jerry Christie's Toyota Highlander note. Hendrix did not know if additional funds were requested to pay off the Boat Loan nor did he state when the Bank released the lien on the Boat. He stated that the Christies' loans were cross-collaterized. The loan documents submitted into evidence included a description of the collateral and a statement that "I am giving a security interest in: collateral securing other loans with you may also secure this loan." The Plaintiff's Travel Trailer Loan listed her name only as borrower, not Jerry Christie's name. She was the sole owner of the Travel Trailer. The Bank's records regarding the Boat Loan identified Jerry Christie as the

---

[1] Hendrix testified that Fort Gibson State Bank was sold in September of 2019. He is currently employed at First Star Bank in Tahlequah, Oklahoma.

[2] Chapman did not testify. Her employment with the Bank was terminated prior to the trial. Her termination was not related to Christies' accounts.

borrower and owner but the UCC Financing Statement identified both Jerry Christie and Pam Christie as Debtors on the Boat Loan. Jerry Christie's note and security agreement regarding the 2006 Highlander listed his name only as borrower, not Plaintiff's name. He was the sole owner of the Highlander. After reviewing the Christies' accounts, Hendrix concluded that the amount the Plaintiff paid in December of 2015 to obtain lien releases was accurate. He therefore declined to return the funds as demanded by the Plaintiff.

The Bank assigned an employee to oversee loans with customers who were involved in bankruptcy, collection or similar legal proceedings. Hendrix himself was unfamiliar with bankruptcy laws and procedures. He stated that it was never his nor the Bank's intent to violate any terms of the Plan or bankruptcy laws. However, it was the Bank's position that the Plaintiff's liens could not be released until she paid for postpetition cash advances. As stipulated by the Bank, the amounts she paid in December of 2015 were specifically tied to the liens released by the Bank.

The Plaintiff testified regarding her banking transactions with Fort Gibson State Bank. Her testimony at times was not credible. She stated that she communicated with Susan Chapman via email or phone calls. The Plaintiff requested several cash advances during her Chapter 13 case. She admitted that she did not obtain permission from the Court to incur additional debt as required by the terms of the confirmed Plan. However, she was in a serious car accident in September of 2011 and incurred major medical bills. She was off work for three months while recovering from her injuries. She inquired of her bankruptcy attorney what options were available to her and he advised that she should keep making her Plan payments. Her husband borrowed funds from his 401k plan and made payments on her Plan. She did not believe that the funds borrowed postpetition would be discharged; however, she was not aware of the method Chapman used to account for these loans.

Hendrix explained that it was a common practice for bank customers to request cash advances by phone. These advances were documented on a loan advance form or by cashier's check. The Plaintiff stated that she would request funds from Chapman and then pick up the cash at the Bank's drive-through window. Hendrix stated that he documented approximately $6,000 in postpetition loans to the Plaintiff that were added to her Travel Trailer loan. The Plaintiff disputed this amount.

The Plaintiff reviewed the cash advance forms submitted into evidence by Fort Gibson State Bank. Each form includes the initials "SC" as Witness with a hand-written notation on the top right-hand corner "Pam Christie 62128". It appears that Susan Chapman added the Plaintiff's name and loan number to these forms. The Plaintiff testified that this notation was not on the forms she signed. One advance form dated simply "3 day of January" without identifying the year, was witnessed and signed by Chapman, and reflects an advance of $2,093.93.[3] On the signature line appears a hand-written notation "to ln p/off". In auditing the Plaintiff's and Jerry Christie's loans, Hendrix determined that this "advance" was applied as a payment to Jerry Christie's 2006 Highlander loan. This amount was added to the balance due on the Plaintiff's Travel Trailer loan. Hendrix could offer no explanation of why this was done regarding a loan that was being paid through the Plaintiff's bankruptcy Plan. The Plaintiff did not remember requesting these funds be advanced to pay her husband's loan. She acknowledged that her signature appears on a cash advance form dated October 3, 2012 for $500, although she did not specifically remember receiving the funds.[4] A loan form dated November 13, 2012 for $1,000 does not include her signature but she remembered borrowing funds in November or December

---

[3] Defendant's Exhibit 9.
[4] Defendant's Exhibit 10.

of 2012.[5] On May 5, 2015, another advance was issued in the amount of $954.08 with the notation in the signature line: "pay off Jerry's loan".[6] The last advance form dated December 3, 2015 for $1,500 does contain the Plaintiff's signature.[7] She testified that she did not request this transaction. The total amount advanced reflected in the Bank's cash advance forms is $6,048.01.

Sometime in late 2015, the Plaintiff received an offer to purchase the Boat pledged on the Real Estate and Boat Loan. She contacted Chapman to ask about getting lien releases on the Boat so she could complete the sale, and on the Travel Trailer and Real Estate. Chapman told her she needed to pay additional funds before the liens on the "big" note and the Travel Trailer could be released. The Plaintiff believed the "big" note was the Real Estate and Boat Loan. She paid the Bank with two money orders issued December 28, 2015, as instructed by Chapman. One money order was in the amount of $10,603.52. The second money order was in the amount of $5,597.07. The Plaintiff stated that once she gave the money orders to Chapman, she was given a lien release for the Travel Trailer but not for Jerry Christie's Toyota Highlander. Hendrix testified that the Bank waited two days for the money orders to clear and then released liens on the Travel Trailer and Jerry Christie's Toyota Highlander. The lien release for the Travel Trailer was entered December 30, 2015.[8] The only evidence provided that the Boat lien was released was from the Plaintiff. She provided a screenshot from the Oklahoma Tax Commission that reflects the lien on the Boat owned by Jerry and Pam Christie was released by Fort Gibson State Bank on December 30, 2015.[9] The Bank's records reflect that three Note

---

[5] Defendant's Exhibit 11.
[6] Defendant's Exhibit 12.
[7] Defendant's Exhibit 13.
[8] Plaintiff's Exhibit 20.
[9] Plaintiff's Exhibit 21. This raises another unanswered question for the Bank. Plaintiff's Plan was modified on May 8, 2015 to reflect that she paid off the Real Estate and Boat Loan early (month 50 of the 60 month plan). The Bank released the Mortgage on May 15, 2015, but

Payment Receipts were issued on December 29, 2015 and a "Cash Out Credit" ticket totaling $16,600.59 for the two cashier's checks.[10] The receipts are signed or initialed by Chapman. Two receipts identify the customer as Pamela Christie, Loan Number of 62128, one receipt in the amount of $5,997.07 and the other for $7.30. A third receipt identifies the customer as Jerry Christie, Loan Number 68188, for $10,578.89. The "Cash Out Credit" ticket is for $17.33.

The Plaintiff's discharge was entered January 8, 2016.

## III. Conclusions of Law

### A. Violation of the Automatic Stay

The automatic stay in 11 U.S.C. § 362(a) provides certain protections for a debtor in bankruptcy. It is "extremely broad in scope" and "applies to almost any type of formal or informal action taken against the debtor or the property of the estate."[11] Among other activities, it stays "any act to create, perfect, or enforce any lien against property of the estate"[12] Any actions taken in violation of the automatic stay are void and of no force or effect, even when there is no actual notice of the existence of the stay.[13]

Section 362(k)(1) provides that an individual injured by a "willful" violation of the stay may recover damages. To establish a claim under § 362(k), the debtor must establish by a preponderance of the evidence that a violation occurred, the violation was committed willfully, and the violation caused actual damages.[14] A "willful" violation occurs if the creditor knew of

---

apparently it did not release its lien on the Boat until December 30, 2015. It offered no explanation regarding this delay. *See* Plaintiff's Exhibits 6, 7, 8 and 9.

[10] Defendant's Exhibit 16.

[11] 3 Collier on Bankruptcy P 362.03 (16th ed. 2019).

[12] 11 U.S.C. § 362(a)(4).

[13] *In re Calder,* 907 F.2d 953, 956 (10th Cir.1990); *Kline v. Deutsche Bank N'tl Trust Co. (In re Kline)*, 472 B.R. 98, 103 (B.A.P. 10th Cir. 2012), *aff'd,* 514 F. App'x 810 (10th Cir. 2013).

[14] *Johnson v. Smith* (*In re Johnson* ), 501 F.3d 1163, 1172 (10th Cir. 2007).

the automatic stay and intended the actions that constituted the violation.[15]  No specific intent to violate the stay is required.[16]  Even a violation committed without knowledge of the stay becomes willful if the creditor fails to remedy the violation after receiving notice of the stay.[17]  The term "willful" refers to the deliberateness of the conduct, coupled with knowledge of the filing.[18]

In this case, it is undisputed that after completion of Plaintiff's Chapter 13 plan the Bank demanded additional funds to release the liens from the Boat and Travel Trailer.[19]  Upon payment of those funds, the Bank released its lien on the Jayco Travel Trailer and, apparently on the Boat as well.[20]  Under the terms of the confirmed plan, the automatic stay remained in full force and effect until the case was closed or the creditor obtained relief from the stay, and prohibited creditors from taking any action to collect their debts from the debtor, debtor's property or property of the estate.  The Plan provided that non-exempt property vested in the debtor at confirmation but remained property of the estate.[21]  The Travel Trailer and the Boat were property of the estate.

Here, the Bank made postpetition advances of credit to the Plaintiff without obtaining court authorization.  It treated these advances as secured by property of the estate, extending and increasing the amount of its secured claim against the Travel Trailer.  It attempted to enforce its

---

[15] *Id.*
[16] *Id.*
[17] *Diviney v. NationsBank of Texas, N.A. (In re Diviney),* 225 B.R. 762, 776 (10th Cir. BAP 1998)
[18] *Kline*, 472 B.R. at 103.
[19] Pretrial Order ¶ 29, Docket Entry 28.
[20] *See* Plaintiff's Exhibit 21.
[21] Christie claimed a partial exemption (valued at $580) of the Travel Trailer on Schedule E.  She valued the Trailer at $21,000. (Case No. 10-82219, Docket Entry 1.)  The Bank's Amended Proof of Claim 9-2 valued the Trailer at $18,000.  Under the terms of the Plan, a partially non-exempt asset vests in the Debtor upon confirmation but remains property of the estate. (Case No. 10-82219, Docket Entry 5, p. 6).

lien by demanding additional monies. It continued to exercise control over the Plaintiff and the Travel Trailer and Boat after she paid the Bank in full under the Plan even though by the terms of the confirmed Plan, it was required to release its liens. Its ultimatum that she must pay additional monies before it would release its liens was a powerful incentive for her to pay the funds demanded. This is the type of pressure the automatic stay is intended to prevent. The Bank is a sophisticated creditor. It was well aware that the Plaintiff was in a Chapter 13 bankruptcy, had notice of the Plan terms, and filed proofs of claim. The Court agrees with the Plaintiff that the proper course for the Bank to follow was to release the liens upon completion of the Plan, then separately pursue collection of the postpetition obligations rather than hold release of the liens hostage for additional payments. By increasing the value of its lien on the Travel Trailer, and later demanding additional funds before it would release its lien the Bank created, perfected and enforced a lien against property of the estate, a clear violation of § 362(a)(4). Actions taken in violation of the automatic stay are of no force or effect. Therefore, the Court finds that the Bank's actions were willful violations of the automatic stay.

The Bank's reliance on language in the Plaintiff's Promissory Note and Security Agreement pledging the Travel Trailer for all present and future debts is misplaced. That language does not give it permission to extend and enforce its lien on the Travel Trailer regardless of the automatic stay in the event of bankruptcy. Such an application is against the clear language and purpose of the automatic stay, which is to give debtors relief from the pressure of creditors, protect property that may be needed for a fresh start, and allow debtors to reorganize.[22] The automatic stay also protects creditors by preventing dismemberment of a debtor's assets by individual creditors levying on the property, thus promoting one of the goals

---

[22] 3 Collier on Bankruptcy P 362.03 (16th ed. 2019).

of bankruptcy of equality of distribution.[23] Hendrix's belief that the loans were cross-collateralized suggests that the Bank treated the Christies' loans and collateral as interchangeable, although this belief is not supported by the loan documents. The loan documents regarding the Travel Trailer, Boat and Toyota Highlander indicate that these were separate notes and collateral, not joint debts, nor jointly owned collateral. The Bank cites no exception to the automatic stay that would justify its actions.

Pursuant to § 362(k), an individual injured by a willful violation of the stay shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, punitive damages. Having found a willful violation of the automatic stay, the Court must assess whether damages should be ordered. The Plaintiff does not dispute that she requested and received postpetition advances totaling $3,000. Although she paid this under pressure from the Bank and under the false representation that it must be paid to release the liens, it is undisputed that the monies she paid to the Bank were for debts owed. The Court believes that when Chapman told the Plaintiff she owed $10,603.52 for the "big" loan, she was referring to Jerry Christie's Toyota Highlander loan since the Real Estate Mortgage had been released in May of 2015.[24] However, the Bank did not explain why Susan Chapman's notations on cash advance forms added to the Plaintiff's Travel Trailer loan indicated that they were to payoff Jerry Christie's loans well before December of 2015. The Bank's procedures for loaning and accounting for cash advances were extremely sloppy and showed a disregard for the bankruptcy process. It is nearly impossible for the Court to track, verify and understand precisely how the cash advances, loan payments and lien releases were accounted for.

---

[23] *Id.*

[24] It is unclear why the Bank stipulated that after the Plaintiff completed her Chapter 13 Plan, it demanded additional funds to release the mortgage from the Real Estate when in fact it had released the Real Estate mortgage in May of 2015.

The Court finds that the Bank's willful violation of the automatic stay caused the Plaintiff to suffer actual damages in the amount of $6,048.01, the amount it added to her Travel Trailer loan. The Court also finds that she should be awarded attorneys' fees in the amount of $10,000 and costs of $317.84. The Court does not find that this case justifies the award of punitive damages. The Bank's actions here, while willful, do not appear to be egregious under the circumstances and practices of the parties. Neither party fully complied with the terms of the confirmed Plan. However, the Court cautions the Bank that it should take the bankruptcy process much more seriously, train and educate its employees regarding bankruptcy laws and rules, review and follow the terms of plans, obtain court approval for actions it takes during the course of a customer's bankruptcy, and recognize the powers and protections afforded debtors by the automatic stay and discharge injunction.

**B.      Violation of the Discharge Injunction**

The Court finds that the Plaintiff did not meet her burden to prove a violation of the discharge injunction pursuant to 11 U.S.C. § 524(a). The discharge order had not yet been entered at the time the Bank demanded additional monies in excess of the Plan payments before it would issue lien releases. It released the liens prior to the entry of the discharge order. The Plaintiff offered no legal authority for its interpretation of § 524(i) that the actual entry of the discharge order is not a prerequisite for the Court to find a violation of the discharge injunction.[25] The Court reads § 524(i) in conjunction with § 524(a). Where a creditor attempts to collect monies from a debtor after a discharge order has been entered for a long-term debt that is not discharged based upon its willful failure to properly credit payments received during the

---

[25] Section 524(i) was adopted to address problems with long-term debts such as home mortgages that are brought current but not paid off during the plan and therefore are not discharged. It provides a remedy for misapplication of payments once a discharge injunction is entered. 4 Collier on Bankruptcy P 524.08 (16th ed. 2019).

duration of the plan term, a discharge injunction violation occurs. Here, Fort Gibson State Bank attempted to collect debts before the entry of the discharge order, not after. Therefore, the Court finds that no violation of the discharge injunction occurred.

## IV. Conclusion

The Court finds that Plaintiff Christie has met her burden to establish a willful violation of the automatic stay by Fort Gibson State Bank and will award her actual damages including attorneys' fees and costs. A separate judgment will be entered in accordance with the Court's findings and conclusions.

###